**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL ACTION FILE** |
| | ) | |
| **LLOYD JOYNER and** | ) | **NO. 1:15-CR-255-ELR/AJB** |
| **DAVE STURGIS, JR.,** | ) | **(Superseding)** |
| | ) | |
| **Defendants.** | ) | |

**UNITED STATES MAGISTRATE JUDGE'S ORDER
AND REPORT AND RECOMMENDATION**

Defendants Lloyd Joyner ("Joyner") and Dave Sturgis, Jr. ("Sturgis") are

charged by way of a superseding indictment with seven Hobbs Act robberies

(Counts One through Four, Six, Eight, and Ten), and using, carrying and brandishing

firearms during and in relation to the robberies charged in Counts Four, Six and Eight

(Counts Five, Seven, and Nine).[1]  [Doc. 62].  They both seek to suppress evidence

seized from them and an automobile when they were arrested, [Docs. 32 (Joyner),

37 (Sturgis)], as well as historical cell site data that the Government collected and

intends to use at trial, [Docs. 43 (Joyner), 48 (Sturgis)].  Joyner also seeks to suppress

electronic tracking device ("ETD") data, [Doc. 35], and moves for the return of seized

---

[1]      Joseph Stowers also is a defendant in Counts Four though Nine, and there
is a forfeiture count.  [Doc. 62 at 5-7].

property, [Docs. 38, 41]. Sturgis also seeks to suppress his post-arrest statements. [Doc. 36]. Finally, Joyner seeks to replace his court-appointed counsel. [Docs. 103, 104].

For the following reasons, the Court **RECOMMENDS** that all of the motions to suppress be **DENIED** except that it is **RECOMMENDED** that his motion to suppress statements, [Doc. 36], be **GRANTED IN PART AND DENIED IN PART**, such that the answers that he gave to questions post-arrest but before being *Mirandized* but that were not biographical, should be **SUPPRESSED**. As to Joyner's motion and amended motion for return of property, [Docs. 38, 41], the Government **SHALL ADVISE** the Court and Joyner in writing within **14 days** of the continued need, if any, to its possession of the property Joyner wants returned. Further, the Court **ORDERS** a hearing on Joyner's motions for replacement of counsel, [Docs. 103, 104], on **June 8, 2016 at 10:00 a.m.**

## I.  *Motion to Suppress Electronic Tracking Device, [Doc. 35]*

In this motion, Joyner challenges on two grounds a June 23, 2015, search warrant that resulted in the installation and monitoring of an ETD on his silver 2009 Pontiac G6. First, he contends that the telephonic warrant was invalid because, as of the time he filed his motion, he had not yet received proof that the warrant was issued

2

in compliance with Federal Rule of Criminal Procedure 4.1. [Doc. 35 at 2-3]. Second, he contends that the warrant application did not show the required nexus between the crimes described in the affidavit and the Pontiac to lawfully allow for the warrant to be issued. [*Id.* at 3-4].

In response, the Government contends that Joyner's motion should be denied because it  contained only conclusory allegations that the warrant was not issued in compliance with Rule 4.1. [Doc. 42 at 5-7]. It also contends that the warrant complied with Rule 4.1, and even if it did not, suppression is not a remedy for the violation of the rule. [*Id.* at 7-8, 9-10]. The Government also argues that the warrant application established probable cause, [*id.* at 10-17], and even if probable cause was lacking, the executing agents relied in good faith upon the propriety of the warrant. [*Id.* at 17-18].

Joyner did not file a reply. (*See* Dkt.).

The undersigned **RECOMMENDS** that the motion be **DENIED**. First, as to Joyner's claim that the warrant was issued not in compliance with Rule 4.1, the motion fails to describe the specifics of the alleged noncompliance. "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . . A court need not act upon general or conclusory assertions. . . ." *United States v.*

3

*Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) (quoting *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) (internal citations omitted)).   Accordingly, the motion is subject to being denied on this ground alone.

In addition, the Government's response and the attachments to it demonstrate that the warrant complied with Rule 4.1. [*See* Doc. 42].  Rule 4.1 allows a magistrate judge to consider information communicated by telephone or other reliable electronic means when deciding whether to issue a warrant or summons, Fed. R. Crim. P. 4.1(a), and further permits the judge to authorize the applicant to sign the judge's name and enter the date and time on the duplicate original of the application and warrant.  Fed. R. Crim. P. 4.1(b)(6)(C).  In this case, Judge King swore the affiant telephonically and then signed the warrant, and the affiant signed Judge King's name on the duplicate original warrant with her express permission.  [*See* Docs. 42 at 4, 42-1 at 2, 42-2, 42-3 at 2, 42-4 at 2].  Rule 4.1 was satisfied.

Moreover, even if the warrant was not issued in compliance with Rule 4.1, suppression of the evidence is not an appropriate remedy in the absence of bad faith.  Fed. R. Crim. P. 4.1(c) ("Absent a finding of bad faith, evidence obtained from a warrant issued under this rule is not subject to suppression on the ground that issuing the warrant in this manner was unreasonable under the circumstances.").  Joyner's

4

motion makes no allegation of bad faith.  *See also United States v. Cazares-Olivas*, 515 F.3d 726, 730 (7th Cir. 2008) (finding that violation of the precursor to Rule 4.1 did not call for suppression of the results of the search and stating that "violations of federal rules do not justify the exclusion of evidence that has been seized on the basis of probable cause, and with advance judicial approval").

Further, the warrant was based on probable cause.  The warrant application showed that the FBI was investigating eleven armed robberies and one attempted armed robbery of CVS stores and similar businesses that were committed by two males between January 3 and June 19, 2015.  An eyewitness in the first robbery reported that the assailants fled in a silver or light blue four-door sedan.  [Doc. 42-2 at 6].  An eyewitness to the sixth robbery described the getaway car as a silver Pontiac, possibly a G6.  [*Id.* at 8].  Eyewitnesses to the eighth robbery described the getaway vehicle as a silver Pontiac, which possibly was a Grand Am.  [*Id.* at 9].

On June 18, the tenth robbery occurred at a Walgreens.  An employee reported that an hour before the robbery, persons he believed looked like the eventual robbers were parked outside in a four-door sedan that possibly was light blue, but that he could not state for sure because the lighting was poor.  [*Id.*].  One of the vehicle's occupants then entered the store and purchased baby wipes using a Delta Community Credit

5

Union ("DCCU") debit card ending in 7240.  [*Id.* at 10].  During the eleventh robbery on June 19, surveillance video showed a silver four-door sedan appearing to be a G6 back into a parking spot at a CVS, which was then robbed by the two males who had exited that vehicle and who then fled in that car.  [*Id.*].  Thereafter, the eyewitness in the tenth robbery identified the vehicle captured in the surveillance video of the eleventh robbery as the same vehicle he saw in the Walgreens parking lot before that earlier robbery.  [*Id.* at 10-11].

Another police officer who owned car lot identified the vehicle in the video as a Pontiac G6.  [*Id.* at 11].  The debit card used before the tenth robbery was associated with an account in Joyner's name, and cash deposits were made into that account following dates that robbers stole cash from the victimized businesses.  [*Id.* at 11-12].  Finally, Joyner financed a silver 2009 Pontiac G6 through the DCCU, and it was that vehicle that the FBI sought the warrant to install and monitor the ETD.  [*Id.* at 12].  These facts established probable cause to believe that installing an ETD on the vehicle would result in information constituting evidence of the robberies and attempted robbery being investigated.  *United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009);

6

*United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991).[2] In addition, there was more than a sufficient nexus between the crimes under investigation and Joyner's G6 to authorize installing an ETD on the G6 and monitoring it.

Therefore, the undersigned **RECOMMENDS** that Joyner's motion to suppress evidence obtained as a result of the ETD warrant, [Doc. 35], be **DENIED**.

## II.    *Motions to Suppress Cell Site Data, [Docs. 43, 48]*

Joyner moves to suppress evidence of cell tower records related to his cell phone because the data was obtained without a search warrant. [Doc. 43 at 2]. Sturgis also moves to suppress the cell site data related to his cell phone on that same basis, and also argues that the Government lacked the requisite specific and articulable facts necessary to obtain an order for such data. [Doc. 48 at 2]. In response, the Government notes that Defendants' argument that cell site data required a search warrant based on probable cause, rather than an order based on the lesser standard of specific and articulable facts, is foreclosed by *United States v. Davis*, 785 F.3d 498 (11th Cir. 2015) (en banc), [Doc. 92 at 4-7], and further that the application satisfied the showing required under 18 U.S.C. § 2703(d) for issuance of the order. [Doc. 92 at 7-8]. It also argues that even

---

[2]        Since probable cause exists, the Court need not discuss whether the fruits of the warrant are saved from suppression by application of the good faith exception to the exclusionary rule.

AO 72A
(Rev.8/8
2)

if the *Davis* decision was not correctly decided, the agents were entitled to rely on the order in good faith.  [*Id.* at 9].

The Government again has the better arguments.   *Davis* held that the Government does not need a probable cause-based search warrant to obtain, as here, historical cell site information under § 2703(d).  *Davis*, 785 F.3d at 513.  That decision is binding on this Court.   *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) (recognizing that "a district court in this circuit is bound by this court's decisions"); *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1508 (11th Cir. 1987) ("Absent a Supreme Court decision to the contrary, district courts are compelled to follow mandates of appellate courts.") (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895); *Sibbald v. United States*, 37 U.S. (12 Pet.) 488, 492 (1838)); *see also Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) ("District courts are . . . bound by the law of their own circuit, and 'are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit to be.' ") (quoting *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981)).  Thus, law enforcement may obtain historical cell site location data by an order issued pursuant to § 2703(d).

Moreover, violations of § 2703(d) are not remedied by suppression of evidence. *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2013) ("The SCA creates criminal and civil penalties, but no exclusionary remedy. . . ."); *see also United States v. Wilson*, 633 Fed. Appx. 750, 753 (11th Cir. Dec. 8, 2015) (same); 18 U.S.C. § 2712(a) (providing that "any person who is aggrieved by any willful violation of this chapter . . . may commence an action in United States District Court against the United States to recover money damages.").

In addition, the Government complied with the requirement of federal law in obtaining the order for historical cell site data. Section 2703(d) permits the issuance of such an order if the application contains "specific and articulable facts" showing that there are reasonable grounds to believe that the records or other information sought is relevant and material to an ongoing criminal investigation. 18 U.S.C. § 2703(d). The application for cell site location data for Sturgis' phone complied with this standard. It set out that the FBI was investigating a conspiracy to commit Hobbs Act robberies of several CVS and Walgreens pharmacies between January 3 and June 19, 2015, and further described the details of robberies on January 3, May 27, June 4, June 16, June 18, and June 19, 2015, as well as facts recounted in Section I, leading law enforcement to identify Joyner through the DCCU debit card and the Pontiac G6. [Doc. 92-4 at 2-7].

9

It also detailed that on June 24, 2015, Joyner and Sturgis were arrested after they were observed traveling to two CVS stores, and located in the vehicle at the time of the arrest were, among other items, two firearms, one of which had a laser sight attached similar to the one observed in the surveillance video from the June 16 robbery; clothing similar to that worn by the robbers in the other robberies under investigation; and a red wallet containing a CVS insurance card and a driver's license for a white male (both Joyner and Sturgis are black). [*Id.* at 8]. When arrested, Sturgis possessed an LG telephone, and it was that telephone's cell site data, among others, that the FBI sought to obtain via the order. [*Id.* at 8-9]. Although Joyner's motion does not expressly challenge the sufficiency of the articulated facts in the order application, the order as to his cell phone was based on a sufficient showing under § 2703(d) as well.

Thus, in this case, the Government's application complied with § 2703(d) by offering sufficiently specific and articulable facts to show reasonable grounds to believe that these records would be relevant or material to the investigation. As a result, the undersigned **RECOMMENDS** that the motions to suppress cell site data, [Docs. 43, 48], be **DENIED**.

10

### III.   Motions to Suppress Statements and Evidence, [Docs. 32, 36, 37]

#### A.   Facts

The Court held an evidentiary hearing on these motions, [Doc. 96 (hereinafter "T_")], from which the following facts are found.  David Fitzgibbons is an FBI Special Agent with six years experience, who is assigned to a task force that investigates violent crimes including commercial armed robberies, bank robberies and kidnapings.  T3-4.  He became involved in the investigation that led to the arrests of the defendants after he was made aware of a be-on-the-lookout ("BOLO") from the Lawrenceville Police Department pertaining to a series of armed robberies occurring at CVS and Walgreens pharmacies on the north side of Atlanta.  T4.[3]  He contacted Lawrenceville Detective Justin Hipps, who had issued the BOLO and organized a multi-agency meeting about the armed robberies on June 18, 2015, after Hipps discovered that in addition to Lawrenceville, similar robberies had been committed in other jurisdictions, such as Sandy Springs and Cobb County.  T5, 122.  Hipps had concluded that the same individuals committed the January 3, 2015 robbery and the May 14, 2015 attempted robbery, both which occurred in Lawrenceville, based on the

---

[3]      Law enforcement also suspected that the same perpetrators attempted to commit an armed robbery on May 14, but all of the employees were in the managers office.  T118.

AO 72A
(Rev.8/8
2)

similarities in the two suspects depicted on the surveillance videos, their clothing and mannerisms inside the stores and, through an information-sharing arrangement with other local jurisdictions, recognition that these persons likely had robbed other locations as well. T120-21. At this multi-jurisdictional meeting, law enforcement discussed the similarities of the various robberies, such as (1) the manner of entry of the robbers' entry into the stores (two black males (one taller than the other) with handguns, the taller robber entered first, the robbers wore dark (generic) clothing and masks or other clothing covering their faces); (2) how the robbers conducted themselves during the robberies (generally rounding up employees and customers and, in addition to obtaining money from the cash registers, they went to the managers' offices where the safes were located); and (3) the similarity in the description of the vehicle used (a silver or light blue four-door sedan, possibly a Pontiac, including a Grand Am). T6-7, 8,119-20, 122-23, 145.[4, 5] The robbers appeared to have semiautomatic handguns, and one of the weapons, a two-tone black and silver handgun, was consistent across several of the robberies. T7.

---

[4]     Another witness described the getaway vehicle as a Chevrolet. T76, 90 (silver Chevrolet sedan), 108.

[5]     Law enforcement did not have any information about a license plate number of any vehicle used in the robberies. T76.

12

Later in the same day that the multi-jurisdictional meeting was held, at 11:45 p.m., a Walgreens was robbed in Marietta by two gunmen, and then, approximately 15 minutes later, a CVS that was located five to six miles away was robbed at gunpoint by two males. T8, 123-24. Fitzgibbons learned of the robberies the next morning (June 19). A surveillance camera at the CVS captured a vehicle at 12:02 a.m. on June 19 backing into a parking spot in front of the business's door. Two individuals with handguns exited from the front and rear passenger sides, while the driver stayed in the vehicle. After robbing the CVS, the robbers entered the vehicle and immediately left. T9, 124.

On June 22, Fitzgibbons went to both the Walgreens and CVS stores and looked at surveillance videos of these robberies. At Walgreens, he learned of an employee who had seen a suspicious person at that store just prior to it being robbed. T10. The employee reported that he was smoking a cigarette outside of the store about an hour before it was robbed and he observed a black male wearing a white tank top sitting in a parked light blue four-door sedan in the parking lot. He did not think much about that but approximately thirty minutes later, he saw the same individual walking around inside the store. Because the employee thought that the individual's actions were suspicious, he approached and asked him if he needed assistance, and after stuttering,

13

the individual asked for baby wipes.  The employee also thought that was suspicious because the baby wipes were located near the front of the store, yet the person had walked around the entire interior of the store.  After the employee showed him the wipes, the person bought the wipes and some candy using a debit card.  T10-12.  The store was robbed approximately thirty minutes later.  T12.  Fitzgibbons obtained the receipt for the debit card purchase, and the debit card (with the last four digits of 7240) was traced to an account at DCCU.  T12-13.

Meanwhile, Hipps showed the June 19 CVS robbery surveillance video to a fellow officer who worked auto thefts and owns a used car lot and so had familiarity with vehicle identification, who then identified the getaway vehicle as a 2008 or 2009 Pontiac G6.  T13, 124-25.  Fitzgibbons also showed a still shot of the getaway vehicle from the CVS robbery to the Walgreens employee, who stated that he was seventy per cent sure that the vehicle depicted in the still shot was the same one that he had seen in the Walgreens parking lot an hour before it was robbed.    T14.[6]

---

[6]       As of the June 19 robbery, Fitzgibbons suspected the same robbers to have committed eleven armed robberies and one attempted armed robbery, generally on the north side of Atlanta; the attempt occurred in Lawrenceville when the two individuals armed with firearms entered the store, but the store's employees were not visible, so they left.  T21-22, 24.

14

On June 23, Fitzgibbons learned that the debit card used at the Walgreens was associated with an account at DCCU in Joyner's name.  T15.  Fitzgibbons also reviewed Joyner's DCCU account statements through May 2015. They reflected unusually large cash deposits dating back to January 2015 that coincided roughly with the dates of some of the armed robberies, and he noticed that Joyner otherwise did not make large cash deposits into this account since his employer paid him via direct deposit.  T16, 86, 105-07.  Fitzgibbons also learned that Joyner financed a silver 2009 Pontiac G6 through DCCU.  T16.  Fitzgibbons obtained an address and phone number associated with Joyner from DCCU, and the license plate number of the G6 (PJG1088). T16, 19.  On the night of June 23, Fitzgibbons obtained an ETD warrant for the G6 and a ping warrant for Joyner's cell phone.  T17-18.  Fitzgibbons determined that the address for Joyner on file at DCCU was likely not his current address, and through utility checks, he determined that Joyner was residing at 3200 Stone Road, Apt. G-13, in the southwest part of Atlanta near College Park.  T19, 28.  The ETD was installed on Joyner's G6 around noon on June 24 while the G6 was parked at the Hidden Creste Apts., 3200 Stone Road, in a parking space next to Apt. G-13.  T19-20, 69.

After the ETD was installed, law enforcement began electronically and visually surveilling the vehicle.  T22-23.  The officers kept a "loose" sort of surveillance on the

15

G6 so as to not be noticed by anyone in the vehicle.  T81.  At a pre-operational briefing on June 24, law enforcement participants involved were shown surveillance photos of the robbers and were advised that the individuals likely were armed (with firearms with extended magazines and one had a laser sight attached) and dangerous (since during some of the robberies, the robbers had held handguns to the backs of the employees' heads).  T25, 126, 153, 174.  The surveillance team was comprised of eleven officers in approximately five vehicles.  T26, 81.  Fitzgibbons rode in his unmarked vehicle with fellow FBI Special Agent Benni Jonsson.  T26.  Hipps rode with Task Force Officer ("TFO") Orelio Feliberty.   The surveillance teams were reporting their observations over the radio to each other.  T34, 126.

At approximately 9:09 p.m. on June 24, the G6 drove by where Fitzgibbons and Jonsson were seated in their vehicle outside the Hidden Creste Apts. complex.  T27, 127.  Visual and ETD surveillance disclosed that the G6 occupants first went to a Chevron gas station about two to three miles away from the apartment and then to a Shell station about one mile away, in an apparent effort to put air in the tires.  During this activity, law enforcement was able to determine that the vehicle was occupied by two black males.  T29-30, 127.  The G6 then was followed and/or tracked as it drove about twenty minutes from the south side of Atlanta to a CVS in Marietta on East

16

Piedmont Road.  T30-31.  The vehicle parked behind the CVS with its headlights turned off, but the brake lights intermittently were illuminated.  T32, 39, 129.  This was suspicious to the agents because some of the other robberies had occurred close to the time certain of the CVS locations closed at 10:00 p.m.  T33. When a Georgia State Patrol trooper, who was not part of  the surveillance team, pulled into the parking lot in his marked trooper unit, after a few minutes, the G6 left the East Piedmont CVS lot "in a hurry."  T33-34, 130.[7]  Hipps and Feliberty followed the G6 from a distance and saw the G6 turn into another CVS store five to six miles away on Powder Springs Street, where it was observed driving around the parking lot and departing.  T34-35, 131-32.

Due to the ETD not communicating and the looseness of the visual surveillance, the other surveilling officers did not know where the vehicle went after it left the second CVS.   Fitzgibbons remained in the vicinity of the Powder Springs CVS and Hipps and Feliberty also returned to that location, and twenty to twenty-five minutes

---

[7]      This same trooper pulled over TFO Stephens and Special Agent Henriques on two occasions as they were trying to catch up with the suspect vehicle, the second time asking them for their credentials.  T154-56, 162.

17

later, the G6 reappeared at the Powder Springs CVS.  T35-36, 74-75, 131-32.[8]  This time, it backed into a parking spot near the front door of the CVS.  T36, 132-33.  After sitting in the vehicle for ten minutes, the driver, who was wearing shorts and a t-shirt, exited and went into the CVS.  T37, 156-57.[9]  He was not wearing a mask.  T147. Fitzgibbons believed that this was an attempt to case the layout of the store and determine the presence of employees.  T38.  Fitzgibbons further believed that after the driver left the store, the occupants would leave, don clothing to rob the store, and return to commit a robbery.  He therefore directed that, when the driver returned to the vehicle, the G6 occupants should be arrested.  T39-40, 134.  At the time he made the arrest decision, Fitzgibbons was unable to connect Joyner's photograph (which he previously had obtained) to any of the armed robbery perpetrators.  T78.

When the driver exited the store and returned to the G6,[10] the officers were not in position to arrest them in the parking lot.  T41.  The G6 pulled onto Reynolds Street

---

[8]    Later post-arrest analysis of ETD data indicated the G6 traveled briefly to at least one apartment complex in Marietta.  T96-97.

[9]    From his perspective, Hipps believed that two persons entered the store. T133, 146-47.

[10]    Surveillance video footage viewed later reflected that the driver bought food in the CVS.  T96-97.

18

and stopped a red light at the intersection of Powder Springs and Reynolds Streets in Marietta. T41-43, 134, 157. TFO Stephens, driving a large pickup truck, was stopped at the red light on Reynolds when the G6 pulled up to his left in the lefthand turning lane. T158. Fitzgibbons and Jonsson approached the G6 in their vehicle from the rear, and when they saw the back-up lights illuminated on the G6 in an apparent effort to evade the forming dragnet, Fitzgibbons pushed his car into the rear bumper of the G6 to prevent it from moving, while Stephens moved his vehicle to block the G6 in front and other law enforcement vehicles completed the encirclement. T43, 134, 158, 177. From his perspective, when Stephens saw other law enforcement officers block the G6 from the front and rear, he saw the passenger—Defendant Joyner—reach down towards the floorboard, a movement that Stephens feared was Joyner reaching for a weapon. T158-59. Stephens got out of his vehicle and yelled to Joyner to show his hands, and when Joyner did not comply immediately, Stephens smashed the side window of the G6 with his long gun, which in turn caused Joyner to raise his hands. Joyner was removed from the vehicle. T93, 159, 166-67. TFO Kim, who was approaching the G6's passenger side, saw firearms laying on the front passenger floorboard and alerted

19

the other officers to their presence. T93, 159, 167; *see also* T190-91.[11]  Joyner at first was put on the ground and handcuffed, and then placed in the rear of a patrol car. T160.

At the same time, Fitzgibbons drew his handgun on the driver, Sturgis, and Sturgis complied with the command to show his hands. T44.  Hipps pointed his AR-15 at Sturgis until he was secured. T135.  Sturgis was removed from the vehicle and placed on the roadway. T45.  Hipps saw another person in dark-colored clothing run down the street, and he and two other officers gave chase, but it was determined that this person, who was not identified in the record, was not involved. T135, 136, 137, 147-48.

Sturgis was asked and denied that the person seen running down the street was with them. T46-47.  Sturgis was handcuffed and searched, and a cell phone was located on his person. T46-48.  Approximately ten minutes later, Sturgis was put into the back of a marked Marietta Police Department patrol car. T49, 93.  Fitzgibbons asked Sturgis who the passenger was, and Sturgis responded that it was his brother. Fitzgibbons also asked him biographical information including where he lived. T51.  Additionally,

---

[11]     Sturgis had not been removed from the vehicle when Kim saw the firearms. T171.

AO 72A
(Rev.8/8
2)

Fitzgibbons asked Sturgis what they were doing in Marietta and he stated that he had been at his brother's apartment or house and were in Marietta to visit some girls they met on Instagram.  T51-52.

Fitzgibbons also obtained biographical information from Joyner once Joyner was secured in the rear of a police car.  T52.  The addresses he gave were the one on his driver's license and his mother's address, but not the 3200 Stone Road address.  T52.  He also may have stated he was coming from the address on his driver's license.  T53.

The G6 was located in the middle of the roadway, so Fitzgibbons decided to have it towed.  T130.  The FBI's inventory policy provides that when the occupants of a vehicle are arrested and the vehicle is to be towed, it must be inventoried to safeguard any valuables in the vehicle, protect the agents from claims of theft or damage, and to remove anything from the vehicle that could harm the agents.  T178; Govt. Ex. 2.  An inventory search was conducted on the G6 before it was towed from the roadway.  T84-85, 91-92, 180; Govt. Ex. 3-4.  Among the items identified on the inventory as being located in the passenger compartment of the trunk of the G6 were a New Jersey Nets baseball cap, a black Beretta handgun with a magazine with 15 rounds, a two-tone .40 caliber S&W handgun with a laser, a CVS bag containing a Coca Cola bottle, chips and a receipt, an Iphone 6+, two LG cell phones, a Samsung cell phone, five black

21

(two possible gray) gloves, a red wallet containing a driver's license and debit card for John Payne,[12] one pair of black shoes, seven black t-shirts, one blue t-shirt, three black baseball caps, a black skull cap, a brown/green hat, a black hoodie, one grey/brown baseball cap, one green/black baseball cap, one pair of black jeans, a blue/black fishing hat, a black do-rag, and a pair of Nike shoes with white trim.  T85, 194; Govt. Ex. 3.

Sturgis and Joyner were transported to the Atlanta Police Department about one and one-half hours after their arrests.  T53-54, 138.  Fitzgibbons and Hipps secured their firearms.  They interviewed Sturgis in a holding area that was furnished with a table and chairs.  T56, 58, 139-40.  He was handcuffed in the front and was secured to the floor with an ankle chain.  T57, 140.  He was given a glass of water.  T58, 103, 143.  He was *Mirandized* by way of a preprinted form that Fitzgibbons read aloud to him.  T58-60; Govt. Ex. 1.[13]  Sturgis signed the form.  T61.  The interview was audio-

---

[12]     Payne was a pharmacist at the CVS store on Johnson Ferry Road that was robbed on June 19, 2015.  *See* [Doc. 42-2 at 10]; Gov't Ex. 3 at 3.

[13]     The form provided, in material part, as follows:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

22

recorded.  T60.  Since Sturgis was able to read the last line of the *Miranda* form, Fitzgibbons concluded that he could read.  T60.  He did not appear under the influence of illegal substances.  T60, 141.  No promises or threats were made to him, and the questioning occurred in conversational tones.  T61, 140-41.

Sturgis stated that on June 23, he was staying at Joyner's apartment at the Hidden Creste Apts., and that he stayed there frequently.  T62-63.  He referred to Joyner as his brother, although they were not related.  T143.  He stated that the black 9 mm. handgun found in the G6 was his, and that he needed it for protection on the street.  T63.  He

---

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

I have read the statement of my rights, and I understand what my rights are.  At this time I am willing to answer questions without a lawyer present.

Gov't Ex. 1; T59-60.  Fitzgibbons had Sturgis read the last sentence out loud.  T60. Sturgis signed the form, Hipps witnessed it, and Fitzgibbons signed as well. Govt. Ex. 1.  The date on the form was June 25, 2015 at 1:28 a.m.  *Id.*

23

denied involvement in the armed robberies under investigation.  T64, 103-04.  The interview ended after one hour when Sturgis indicated that he did not wish to speak further.  T64, 143, 156.

Although the agents attempted to interview Joyner, he stated that he did not want to speak with them because he did not feel well since he took a Xanax.  T65, 143-44.

### B.    Contentions

The Government argues that probable cause existed to arrest the defendants for conspiracy to commit a Hobbs Act robbery.  [Doc. 107 at 18; *see also* Doc. 1 (Criminal Complaint)].  It argues that by June 24, there had been eleven unsolved robberies and one attempted robbery of pharmacy stores in the Atlanta area, committed by at least two black males brandishing firearms, wearing disguises, using a similar modus operandi and driving a light blue or silver four-door sedan.  It contends that at least the June 18 and 19 robberies pointed to Joyner as a suspect because his debit card was used in the Walgreens before it was robbed and surveillance video showed the robbers arriving in a silver or light blue 2008 or 2009 Pontiac.  Further investigation showed that Joyner owned a silver 2009 Pontiac G6.  Also, his bank's records showed an unusual record of cash deposits into his bank account around the times of the robberies.  [Doc. 107 at 20].

24

The Government then argues that once law enforcement engaged in electronic and visual surveillance of Joyner's G6, on June 24 the officers learned that two black males were in the vehicle, consistent with the fact that the latest robberies were conducted by two black males, and that the G6 drove directly to Marietta, Georgia, which coincidentally was the location of the last two robberies. [*Id.*].  It then recounts that the G6 pulled behind the CVS and parked with its headlights off, which Fitzgibbons thought was suspicious since it was shortly before 10:00 p.m., a time when some of the other robberies had occurred; and the G6 stayed there until it left quickly upon the arrival of the GSP trooper, and then drove to another CVS.  [*Id.* at 20-21]. The Government resumes that, after a twenty to twenty-five minute interval during which the officers did not know the G6's location, the G6 returned to the original CVS store.  Just as in the June 18 robbery, one of the G6's occupants went into the store wearing regular clothing and made a small purchase in an effort to case the store.  [*Id.* at 21].  It then argues that probable cause existed to arrest Joyner because a car matching the description of his vehicle was sighted multiple times at other robberies, his debit card was used just before the June 18 robbery, and cash deposits into his account correlated to dates of other robberies.  [*Id.*].  It also argues that probable cause supported Sturgis's arrest because he drove Joyner's vehicle from south

AO 72A
(Rev.8/8
2)

Atlanta directly to Marietta (where two CVS stores had been robbed the week before), first to the East Piedmont CVS, where the vehicle parked behind the store with the headlights off shortly before closing time until the trooper vehicle arrived, then drove to Powder Springs CVS store briefly, and then, similar to the June 18 robbery, upon returning to the Powder Springs CVS, Sturgis went into the store in what law enforcement believed was an effort to case the store before the robbery. [*Id.* at 21-22].

In response, Sturgis argues that probable cause for his arrest was lacking. In support, he challenges the assumptions upon which Fitzgibbons based his arrest decision as mere unsupported hunches. Thus, he argues that Fitzgibbons' arrest decision on June 24/25 was based in large part on the robberies that occurred on June 18 and 19. He acknowledges that those robberies led investigators to identify Joyner since his debit card was used on June 18 shortly before the robbery, [Doc. 110 at 3], and that his vehicle resembled the description of the vehicles in some of the robberies, but he later notes that the descriptions of the vehicle were not consistent as to color or model, nor were there any specific facts or identifications given about this vehicle. [*Id.* at 6-7]. Also, he claims that although the Walgreens employee concluded that the debit card user's conduct was suspicious, that witness did not give any reason to support his suspicions. [*Id.* at 2]. Further, despite a clear opportunity to

26

observe and describe this supposedly suspicious individual, the employee gave no description, even though that person was wearing a sleeveless shirt and descriptions of both robbers in previous robberies were that the assailants had visible tattoos on their hands. [*Id.* at 2, 7]. Sturgis also contends that the Walgreens employee only noted one person seated in the vehicle in the parking lot, and admitted that he had a thirty per cent chance of wrongly identifying the vehicle he observed. [*Id.* at 3, 8]. Sturgis argues, therefore, that only mere suspicion or a hunch supports the conclusion that the person buying baby wipes was the later robber, and points out that Fitzgibbons conceded that he did not have probable cause before initiating surveillance on June 24. [*Id.* at 8 (citing T115)]. Thus, Sturgis argues, there is nothing but temporal proximity linking the debit card user to the subsequent robbery. [*Id.* at 2-3].

He also submits that in none of the first ten robberies was there any evidence that the robbers cased any stores before the actual robbery, and further that there was no evidence that his entry into the CVS to purchase items amounted to casing. [*Id.* at 3]. He also challenges the Government's argument as to the cash deposits in Joyner's account, observing that two cash deposits of $1750 were made nine days after a robbery where several hundred dollars were stolen and the next closest robbery was almost six weeks prior to these deposits. [*Id.* at 3-4, 7].

27

He then argues that Hipps' testimony about the G6's occupants' reaction to the trooper's arrival at the CVS could not be relied upon because (1) the record shows that the trooper's vehicle stayed at the CVS only momentarily; (2) Hipps testified that he believed that the G6's occupants saw the trooper even though the trooper was in the front and the G6 was in the rear of the CVS, and Hipps' vantage point did not allow him to see any of this (although he later testified he could see the trooper but not the suspects); (3) he testified that he saw both suspects enter the CVS in dark clothing, even though Fitzgibbons testified that only driver entered and wore shorts and a t-shirt; and (4) Hipps suspected that a third person was involved (and chased him) even though there was no evidence to support a third person being involved on June 24.  [*Id.* at 3-5].

Sturgis next submits that even though Joyner was known by law enforcement as of the time that the G6 stopped at two gas stations to get air, there was no identification that he was in the vehicle until his arrest, and Sturgis was not identified until his arrest. He further notes that when he and Joyner were observed at the gas stations, surveillance agents did not report that they were wearing black or dark clothing that was consistent with the modus operandi of the previous robberies.  [*Id.* at 8-9].

Also, he claims that it is mere speculation that the G6 occupants were "'spooked'" by the appearance of the trooper because there is no evidence that they saw

28

the vehicle, and the Government's speculation does not explain why they just would have waited until the trooper left to rob the store.  [*Id.* at 9].

Sturgis also challenges the assumption that after the G6 left the first CVS and drove to the second one, this was part of a plan to rob the second one.  He argues that since the vehicle only drove through the parking lot of the second store and then later review of the ETD logs reflected that the vehicle was in a residential neighborhood for twenty to twenty-five minutes and the defendants did not change into clothes consistent with the modus operandi of the previous robberies, these facts support Sturgis' post-arrest statement that they were trying to link up with women they communicated with over Instagram.  [*Id.* at 9-10].

Sturgis next argues that although the suspicion that Joyner's vehicle was involved was reasonable, he argues that the officers had only reasonable suspicion to effectuate an investigative detention, and not probable cause authorizing a full-blown arrest.  [*Id.* at 11].  He distinguishes *United States v. Burston*, Criminal Action No. 1:12-CR-180-01-JOF/AJB, 2013 WL 787909 (N.D. Ga. Jan. 4, 2013) (R&R), *adopted* 2013 WL 787911 (N.D. Ga. Mar. 1, 2013) (Pannell, J.), relied upon by the Government, where the Court held that the officer had reasonable suspicion that ripened into probable cause upon the defendants' flight from a lawful command of the

29

officer to stop.  [Doc. 110 at 12-13 (citing *Burston*, 2013 WL 787909 at *7)].  As a result, he argues, the evidence seized from the vehicle should be suppressed.  [*Id.* at 15].

He also argues that the statements he made at the scene of his arrest should be suppressed due to Fitzgibbons' failure to *Mirandize* him.  [*Id.* at 14].

In his response to the Government's brief, Joyner adopts the arguments made by Sturgis, [Doc. 111 at 1 & Ex. A], and also argues that at most, there was only reasonable suspicion to support an investigative detention and not probable cause to support an arrest.  [*Id.* at 1-2, 5].  He contends that Fitzgibbons made the arrest decision not based on probable cause but out of a concern that the G6's occupants were leaving the CVS and he did not want to lose them again.  [*Id.*].  He argues the officers did not know who was in the vehicle, that only the race of the described robbers and the G6's occupants matched, the only connection to the previous robberies and the defendants was that they drove to a CVS, and law enforcement had not developed any fingerprint, DNA or identification evidence.  [*Id.* at 5-6].  Instead, since Fitzgibbons was going to arrest anyone in that vehicle, Joyner argues that there was a failure of particularized probable cause.  [*Id.* at 6].

30

In reply, the Government argues that the arrests were supported by probable cause. It first argues that the defendants incorrectly characterized the cash deposits into Joyner's account. [Doc. 112 at 3]. It points out that the criminal complaint shows that he made two deposits of $800 and $500 two days after the January 3, 2015 CVS robbery that netted $6,559, [*id.* (citing [Doc. 1 at 4])]; a deposit of $2,000 two days after the January 31 robbery of $9,363, [*id.*]; and two deposits of $750 and $1,000 two days after a May 27 robbery of $5,000, [*id.* (citing [Doc. 1 at 6])]. The Government argues that these deposits contributed to the probable cause mix. [*Id.*].

As for the trooper incident, the Government states that the record provides that the trooper was not at the CVS momentarily, but parked at that location. [*Id.* at 4 (quoting T155, 156)]. It also contends that Hipps did not contradict his own testimony, since he testified that he could not see the trooper enter the first CVS lot, and when he referred to a patrol car at the CVS after the defendants returned, he was referring to Fitzgibbons' vehicle. [*Id.* at 4-5]. It also argues that Hipps did not state that he saw the defendants enter the CVS but only that he saw two males enter the store, but that he could not tell from his vantage point from where they came. [*Id.* at 5 (citing T146)]. It also contends that Hipps' description of the dark clothing worn by the persons who entered the store is not inconsistent with Fitzgibbons' testimony that the driver was

31

wearing a t-shirt and shorts because these clothes could have been dark.  [*Id.*].  The Government also argues that Hipps' credibility is not suspect just because he chased a third person who ran from the scene.  [*Id.*].

It also urges the Court to reject Sturgis' rhetorical string of questions about the facts posed to discredit the existence of probable cause.  It claims that the alternative scenarios Sturgis suggested are minor deviations in planning the robbery and that in any event, the officers did not need to discount all potential innocent explanations in considering whether there was probable cause.  [*Id.* at 6].  The Government also responds to Joyner's argument that the officers did not know who was in the G6 by contending that neither defendant was arrested only for being merely present, and instead argues that Sturgis' presence with Joyner was evidence of his engaging in a common endeavor.  [*Id.* at 7 (citations omitted)].

It next argues that even if there was not probable cause to arrest the defendants at the time of the takedown, the officers had independent probable cause to search the vehicle, noting that both defendants conceded that there was reasonable suspicion to believe the vehicle was involved in the robberies.  [*Id.* at 8].  The Government argues that the vehicle was properly searched under the so-called automobile exception, because it was mobile and there was probable cause to believe there would be evidence

32

of crimes contained in the vehicle, since a vehicle matching its description was sighted at multiple robberies, including an exact match of color, make, model and year at the June 19 robbery; and the robbers were seen both exiting and reentering that vehicle after that robbery. [*Id.* at 8]. It further contends that in all of the earlier robberies, the assailants wore masks and disguises and carried guns, so there was a fair probability that such items would be located in the vehicle that had just driven from south Atlanta to Marietta, where two recent robberies occurred. [*Id.* at 8-9]. The Government argues that, therefore, the vehicle lawfully could be stopped and the defendants removed and patted down because the use of firearms in the prior robberies made it likely that the occupants were armed and dangerous; thus, the cell phone in Sturgis' pocket was lawfully located and seized. [*Id.* at 10].

It also argues that since the defendants concede that reasonable suspicion existed, Stephens' reasonable belief that Joyner was reaching for a weapon justified taking Joyner out the vehicle and then, when firearms were observed in plain view, Sturgis was properly patted down. [*Id.* at 12-13].

The Government also contends that Sturgis' pre-*Miranda* statements are admissible either as biographical information or as "general on the scene

questioning." [*Id.* at 15 (quoting *Garcia v. Singletary*, 13 F.3d 1487, 1489 (11ᵗʰ Cir. 1994))].

### C.     Discussion

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. CONST. AMEND. IV. "In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause."  *United States v. Magluta*, 418 F.3d 1166, 1182 (11ᵗʰ Cir. 2005).  Evidence obtained in violation of the Fourth Amendment must be suppressed.  *United States v. Gilbert*, 942 F.2d 1537, 1541 (11ᵗʰ Cir. 1991).  Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution.  *United States v. Freire*, 710 F.2d 1515, 1519 (11ᵗʰ Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5ᵗʰ Cir. 1973)); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11ᵗʰ Cir. July 8, 2009) (same).  Thus, the Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.  The Government also bears the burden  to

34

AO 72A
(Rev.8/8
2)

demonstrate the legality of a warrantless arrest. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Tobin*, 923 F.2d 1506, 1521 & n.21 (11th Cir. 1991).

First, the Court agrees that probable cause supported the defendants' arrest just after they left the Powder Springs CVS pharmacy the second time.  Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense."   *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002); *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992); *see also Johnson v. United States*, 333 U.S. 10, 16-17 (1948) (recognizing that evidentiary fruits of a search can never be used to supply probable cause for an antecedent arrest); *Dudley v. United States*, 320 F. Supp. 456, 462 n.3 (N.D. Ga. 1970) (Smith, J.) (stating that "after-acquired information . . . could not aid in a determination pf probable cause as of the time of the search").  "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972).

In determining whether probable cause exists, the Court " 'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life

on which reasonable and prudent men, not legal technicians, act.' " *Illinois v. Gates*, 462 U.S. 213, 229-31 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*,  540 U.S. 366, 371 (2003) (internal punctuation marks and citations omitted).  However, an officer is not required to resolve all inferences and all factual conflicts in favor of the suspect.  An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect. *Bailey v. Board of County Comm'rs of Alachua County, Fla.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992); *United States v. Pantoja-Soto*, 739 F.2d 1520 (11th Cir. 1984).  Thus, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.  By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause. . . ." *Gates*, 462 U.S. at 243 n.13.

Officers may rely on information received from an "identified bystander or victim-eyewitness to a crime." *United States v. Martin*, 615 F.2d 318, 325 n.9

36

AO 72A
(Rev.8/8
2)

(5th Cir. 1980) (quoting *United States v. Bell*, 457 F.2d 1231, 1238 (5th Cir. 1972)).[14]

Such persons are deemed generally reliable because they "are not 'intimately involved

with the persons informed upon and with the illegal conduct at hand' as other

informants often are." *Id.* Moreover, when a group of officers is conducting an

operation and there exists at least minimal communication between them, their

collective knowledge is determinative of probable cause. *United States v. Goddard*,

312 F.3d 1360, 1362 (11th Cir. 2002); *United States v. Wilson*, 894 F.2d 1245, 1254

(11th Cir. 1992); *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984).

The Court's focus must be not upon each fact in isolation but " 'the sum total of

layers of information and the synthesis of what the police have heard, what they know,

and what they observe as trained officers.' " *Wilson*, 894 F.2d at 1254 (quoting *United

States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977), and *Smith v. United States*,

358 F.2d 833, 837 (D.C. Cir. 1966)). To determine whether an officer had probable

cause to arrest an individual, the Court examines the events leading up to the arrest, and

then decides "whether these historical facts, viewed from the standpoint of an

objectively reasonable police officer, amount to" probable cause. *Pringle*,

_____

[14]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)
(en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the
former Fifth Circuit handed down prior to the close of business on September 30, 1981.

37

540 U.S. at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).  The observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the circumstances that might create probable cause for an arrest.  *Gonzalez*, 969 F.2d at 1003.  Probable cause " 'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.' " *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (quoting *Wilson v. Attaway*, 757 F.2d 1227, 1236 (11th Cir. 1985)).

Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been.  *See, e.g., Whren v. United States,* 517 U.S. 806, 813-14 (1996) ("Subjective intentions play no role in ordinary, probable-cause, Fourth Amendment analysis."); *Ornelas*, 517 U.S. at 696 (probable cause is based upon evaluation of the "facts, viewed from the standpoint of an objectively reasonable police officer"); *United States v. Roy,* 869 F.2d 1427, 1433 (11th Cir. 1989) (rejecting notion that probable cause turns on what law enforcement officers think and holding that "[c]ourts determine the existence of probable cause"); *see also Horton v. California,* 496 U.S. 128, 138 (1990) ("[E]venhanded law enforcement is best achieved by the application of objective

38

standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").

Here, probable cause was established by the following facts known to law enforcement at the time of the arrests. Law enforcement were investigating a series of armed robberies had taken place on the north side of Atlanta at CVS and Walgreens pharmacies shortly before closing time by at least two black males who wore dark clothing and masks. The robberies appeared to be perpetrated by the same individuals due to their modus operandi—dark clothing, masked faces, one robber taller than the other, type of store targeted, interested in both the managers' safes as well as the cash registers, and the level of violence employed by the robbers. In one incident, the robbers entered the store only to not find any employees (who were gathered out of sight) and then left. Witnesses described the getaway vehicle in a number of these robberies as a silver or light blue four-door sedan, and some but not all of the witnesses identified it as a Pontiac. On June 18, a Walgreens was robbed in a similar fashion, and police learned that approximately one hour before that robbery, a black male was observed in a vehicle similar to those previously described as the getaway car, and then thirty minutes before the robbery, that individual came in and purchased baby wipes and candy using a debit card traced to Joyner's bank account. The Walgreens employee

39

from the June 18 robbery was seventy per cent sure that the Pontiac G6 identified as the getaway car in the June 19 CVS armed robbery shortly after the Walgreens robbery was the same vehicle he saw in the parking lot before the male bought baby wipes. The police were entitled to credit and rely upon the employee/eyewitness' description of the person's behavior as suspicious; rather than being unsupported as the defendants claim, the employee/witness articulated his suspicions, including the baby-wipes buyer's hesitation after being asked if he needed assistance, and his walking throughout the interior of the store for an item that was located up front. While it would have better if law enforcement had testified about any physical description this witness gave, the lack of description is not fatal to probable cause because the witness's other information is specific enough. Law enforcement then learned that the vehicle parked outside of this robbery was a 2008 or 2009 Pontiac G6, and in tracing the debit card used by the baby-wipes buyer to Joyner, law enforcement learned both that Joyner owned a 2009 silver four-door Pontiac G6 and also that, despite a job which paid him through direct deposit, he was depositing large amounts of cash into his bank account two days after several of the robberies.

Law enforcement then observed Joyner leave his apartment on the south side of Atlanta with another black male and drive directly to Marietta, where within the week

40

of the surveillance robbers had armed-robbed a Walgreens and CVS.  The G6 drove directly to the East Piedmont CVS close to closing time, where it backed in and parked in the rear of the CVS with its headlights off, until it quickly left shortly after a Georgia State Patrol trooper pulled into the parking lot.  The G6 then was driven to the CVS on Powder Springs in Marietta, remaining there only momentarily, and then, after law enforcement had difficulty tracking and surveilling the G6 for twenty to twenty-five minutes, it then reappeared at the Powder Springs CVS, where the G6 backed in at the front of the store, and the occupants waited ten minutes before the driver got out and entered the store.

An objectively reasonable police officer could conclude from all of these facts, as the Court does, that there was "a probability or substantial chance of criminal activity" based on the G6's occupants otherwise "innocent behavior [that] . . . provide[s] the basis for a showing of probable cause. . . ." *Gates*, 462 U.S. at 243 n.13.  The Court notes that based on the vehicle, use of his debit card, the cash deposits and activities observed on the night of June 24, there was probable cause that Joyner was present in the G6 and probable cause to believe that he was engaged in an Hobbs Act conspiracy.  Given the modus operandi of the robberies and attempted robberies, there was probable cause to believe that the other person in the vehicle was (one of)

41

AO 72A
(Rev.8/8
2)

Joyner's coconspirators. The police reasonably believed that the G6 driver (whom they ultimately identified as Sturgis and thus inferred that he was driving the entire time) back-in parked the G6 at the Powder Spring CVS and turned off its lights so the store could be surveilled, left upon the appearance of the trooper, drove to the other CVS, and then returned to the Powder Springs store, where he backed in (for easy exit) and entered the store to see who was present.[15] While the defendants argue that there were facts that point to a lack of probable cause, probable cause is determined from the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *Pringle*, 540 U.S. at 371), and so, for example, the defendants' travels to an apartment complex when the officers lost track of the G6 or Sturgis' purchase of food inside the CVS, were facts not known to the arresting officers at the time and need not be considered. *See United States v. Booker*, 612 F.3d 596, 601 (7th Cir. 2010) ("The possibility of an innocent explanation does not vitiate properly established probable cause.").

Thus, the defendants were properly arrested. Sturgis' cell phone was properly seized as a search incident to his lawful arrest. *United States v. Robinson*,

---

[15] The Court notes that the attempted robbery in Lawrenceville was aborted because as the robbers went inside the store, the employees were not visible to them, and so logically the robbers cased the stores before some of the subsequent robberies.

42

414 U.S. 218, 235 (1973).  The weapons, items of clothing and additional cell phones in the G6 were observed and properly seized (1) through conduct of a lawful inventory, *see Florida v. Wells*, 495 U.S. 1, 4 (1990); (2) as being in plain view, *Horton v. California,* 496 U.S. 128, 136-137 (1990); *United States v. Hromada*, 49 F.3d 685, 690 (11th Cir. 1995), or (3) as "a search incident to a lawful arrest [since] it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' " *Arizona v. Gant*, 556 U.S. 332, 343 (2009) (quotation omitted); *United States v. Grice*, 335 Fed. Appx. 924, 927 (11th Cir. July 2, 2009) (same).  The robberies under investigation were committed by two armed men wearing dark clothing and wearing masks or some other face-covering headgear that was likely contained inside the G6.

Accordingly, the undersigned concludes that the defendants were lawfully arrested and the G6 was properly searched.[16]

---

[16]    Having concluded that there was probable cause to arrest the defendants and search their persons and the vehicle, the Court need not discuss the Government's alternative argument, raised for the first time in its reply brief, that independent of probable cause to arrest, there was probable cause to search the G6.  The Court generally does not consider arguments raised for the first time in a reply brief, *United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984) (citing *United States v. Benz*, 740 F.2d 903 (11th Cir. 1984)), although the Court could construe the Government's argument as a response to the defendants' argument that only reasonable suspicion existed.

43

As for Sturgis' post-arrest, pre-*Miranda* statements, the Court agrees that those questions that constitute biographical or book-in type questions are excluded from *Miranda*'s protections and are not subject to suppression as being obtained without a voluntary *Miranda* waiver. *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation omitted); *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) (holding that an officer's request for " 'routine' information for booking purposes is not an interrogation under *Miranda*, even though that information turns out to be incriminating") (quoting *United States v. Sims*, 719 F.2d 375, 378-79 (11th Cir. 1983) (*per curiam*)); *see also Harryman v. Estelle*, 597 F.2d 927, 930-31 (5th Cir. 1979) (non-investigative questioning of detainees, such as biographical inquiries, not to be subject to *Miranda* rule); *United States v. Jones*, 457 F.2d 697, 699 (5th Cir. 1972) (holding it not necessary to give defendant *Miranda* warnings before asking him his name).

However, without obtaining a waiver of the suspect's *Miranda* rights, police may not ask questions (even during booking) that are designed to elicit incriminatory admissions. *Muniz*, 496 U.S. at 602 n.14 (citation and quotation marks omitted). Fitzgibbons' questions to Sturgis about the passenger's name, what Sturgis was doing in Marietta, or where he came from, are the type of questions *Miranda* prohibits without warnings.

44

*Garcia v. Singletary*, 13 F.3d 1487 (11th Cir. 1994), relied upon by the Government, is not controlling in this case because the facts are easily distinguishable. In *Garcia*, the defendant was in jail and was seen stuffing his mattress into a fire in his sink. A jailer extinguished the flames and asked him why he set the fire without advising him of his *Miranda* rights. 13 F.3d at 1488-89. While recognizing that *Miranda* warnings are necessary whenever law enforcement officers question a person after taking that person into custody or otherwise significantly depriving a person of freedom of action, *Garcia* held that "[g]eneral 'on-the-scene questioning,' however, concerning the facts and circumstances surrounding a crime or other general questioning of citizens during the fact-finding process do not trigger *Miranda* warnings." *Garcia*, 13 F.3d at 1489 (citing *Miranda v. Arizona*, 384 U.S. 436, 477 (1966); *United States v. Scalf*, 725 F.2d 1272, 1276 (10th Cir. 1984)). *Scalf*, like *Garcia*, involved a prison inmate. The Supreme Court has held that just because one is a prison or jail inmate, all questioning is not transformed into a custodial interrogation. *See Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012) (holding that inmate taken from cell to conference room for questioning was not "in custody" for *Miranda* purposes under the circumstances, "especially the undisputed fact [he] was told that he

45

AO 72A
(Rev.8/8
2)

was free to end the questioning and return to his cell"). *Garcia* implicitly recognized

the distinction between custodial and non-custodial questioning in a jail setting:

> Upon discovering the fire, [the guard] directed Garcia to leave his cell.
> After leaving the cell, Garcia stood in the hallway outside the cell while
> [the guard] extinguished the fire.  In this manner, [the guard] did not
> isolate, intimidate, coerce, or otherwise pressure Garcia into making a
> statement.  Because Garcia was the only person in the cell during the fire
> and failing to remove him would have endangered his safety, [the guard]'s
> action added no further restraint on Garcia's freedom to depart.  In fact,
> removing Garcia from his cell provided him with greater freedom of
> movement and significantly reduced those preexisting restrictions

*Garcia*, 13 F.3d at 1492.  And, in fact, the *Miranda* court expressly discussed what it

meant about general on-the-scene questioning:

> Our decision is not intended to hamper the traditional function of police
> officers in investigating crime.  . . .  When an individual is in custody on
> probable cause, the police may, of course, seek out evidence in the field
> to be used at trial against him.  *Such investigation may include inquiry of
> persons not under restraint.  General on-the-scene questioning as to facts
> surrounding a crime or other general questioning of citizens in the
> fact-finding process is not affected by our holding.*  It is an act of
> responsible citizenship for individuals to give whatever information they
> may have to aid in law enforcement.  In such situations the compelling
> atmosphere inherent in the process of in-custody interrogation is not
> necessarily present.

*Miranda*, 384 U.S. at 477-78 (internal citation omitted) (emphasis supplied).  Thus,

"on-the-scene" questioning without providing *Miranda* warnings is appropriate for

questioning those persons who are not in custody.  Applying *Garcia*'s holding to the

questioning  of Sturgis, who clearly was in custody, would effectively obliterate *Miranda*'s guarantees.  Thus, the answers Sturgis gave following his arrest but before he was *Mirandized* that were not biographical should be excluded from his trial.

Therefore, for the reasons stated above, the undersigned **RECOMMENDS** that the defendants' motions to suppress evidence, [Docs. 32 (Joyner), 37 (Sturgis)], be **DENIED** and that Sturgis motion to suppress statements, [Doc. 36], be **GRANTED IN PART AND DENIED IN PART**.  Specifically, any statements Sturgis made after his arrest but before he was *Mirandized* and that are not biographical should be **SUPPRESSED**, but all other statements should not be suppressed.

### IV.    *Motion and Amended Motion for Return of Seized Property, [Docs. 103, 104]*

Joyner seeks the return of the G6 for which he alleges he is still is incurring financing charges, and for damages to the vehicle.  [Docs. 38, 41].

Federal Rule of Criminal Procedure 41(g) governs return of seized property. That rule provides, in relevant part, "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g).

The Advisory Committee Notes accompanying the 1989 amendments to what is now Rule 41(g), shed some light on the appropriate standard for determining Joyner's

motions where, as here, the property involved does not constitute contraband and is not otherwise alleged to be forfeitable.  In those Notes, the Advisory Committee explained,

> If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable.  But, if the United States' legitimate interests can be satisfied even if the property is returned, continued retention of the property would become unreasonable.

Fed. R. Crim. P. 41(g), Advisory Committee Notes to 1989 Amendments of Rule 41(e).

Under this standard, a criminal defendant is "presumed to have the right to the return of his property once it is no longer needed as evidence." *United States v. Dean*, 100 F.3d 19, 20 (5th Cir. 1996); *United States v. Mills*, 991 F.2d 609, 612 (9th Cir. 1993).  In determining whether the Government's need for the evidence continues to exist, courts look to the Government, which bears the burden of proof in demonstrating a legitimate reason why it continues to require possession of the seized property.  *See United States v. Ogbonna*, 34 Fed. Appx. 150 (5th Cir. Mar. 11, 2002) (citing Fed. R. Crim. P. 41(g), Advisory Committee Notes); *see also Mills*, *supra*.

AO 72A
(Rev.8/8
2)

Therefore, the Government is **DIRECTED** to advise the Court and Joyner in writing within 14 days of this Order whether it still has a need to retain the property Joyner seeks returned pursuant to his motion and amended motion.[17]

## V.    Conclusion

For all of the foregoing reasons, the Court **RECOMMENDS** that all of the motions to suppress, [Docs. 32, 35, 36, 37, 43, 48] be **DENIED** except that it is **RECOMMENDED** that the answers that Sturgis gave to questions at the scene of his arrest and before he was *Mirandized* that were not biographical be **SUPPRESSED**.  As to Joyner's motion and amended motion for return of property, [Docs. 38, 41], the Government **SHALL ADVISE** the Court and Joyner in writing of the continued need, if any, to its possession of the property sought to be returned within **14 days of this Order**.  Further, the Court **ORDERS** a hearing on Joyner's motions for replacement of counsel, [Docs. 103, 104], on **June 8, 2016 at 10:00 a.m.**[18]

---

[17]    On the other hand, Rule 41(g) is not the appropriate vehicle to attempt to receive money from the Government for alleged damages to seized personal property. Sovereign immunity protects the Government from money damages sought under Rule 41(g).  *United States v. Potes Ramirez*, 260 F.3d 1310, 1315-16 (11th Cir. 2001).

[18]    If this hearing is no longer necessary, Joyner should so advise the Court well in advance of the scheduled hearing date.

49

**IT IS SO RECOMMENDED AND ORDERED**, this the 24th day of May, 2016.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)